2.   **RATING PROVISIONS:**

    a.    Rates - per Declarations:

        (1)    Drilling Rates apply for the period during which any Well Insured is being drilled and/or deepened and/or completed, and, if the Insured is purchasing coverage hereunder for its other Wells at inception, during the remaining period of this Policy, if any;

        (2)    Workover Rates apply for the duration of the Workover of any Well Insured and, if the Insured is purchasing coverage hereunder for its other Wells at inception and pays a premium for the Workover of the Well Insured, during the remaining period of this Policy, if any;

        (3)    Rates for Wells Insured other than as set out in Paragraphs 2a(1) and 2a(2) above are annual but shall not apply to Wells Insured for which premium at Drilling Rates under Paragraph 2a(1) or Workover rates under Paragraph 2a(2) of these Common Conditions has been paid under this Policy.

    b.    The maximum vertical depth of the Well Insured shall determine the applicable depth band in Declarations Item 9.

    c.    Premium for each Well Insured shall be the product of the applicable drilling rate (2b above) and the total footage drilled measured through the hole from the surface of the ground or water bottom to the bottom of the Well Insured and other rating factors as may be agreed herein.

    d.    Premium applicable to deepening of Wells Insured shall be the product of the applicable drilling (2b above) and the total footage drilled measured through the hole from the surface of the ground or water bottom to the bottom of the Well Insured and other rating factors as may be agreed herein.

3.   **RATING AREAS:**

    Area 1    Land areas in the United States of America and Canada, excluding:

        (a)    Alabama, Alaska, Arizona, Colorado, Florida, Louisiana, Mississippi, Montana, New Mexico, Texas Railroad Commission Districts 1 through 4 inclusive, Utah, Wyoming;

        (b)    North of 60° North Latitude, South of 24° North Latitude, West of 140° West Longitude, and East of 52° West Longitude; and

*Common Conditions*

2

Ed. (1/98)

HOL 01676

(c)     Texas Railroad Commission Districts 5 through 10 inclusive and Oklahoma, but only as respects those Wells deeper than 10,000' rating depth band as defined herein.

Area 2     All land areas worldwide, excluding:
(Land)

    (a)     Area 1 as defined above; and

    (b)     North of the Arctic Circle and South of the Antarctic Circle.

Area 2     Inland waters of the United States of America and Canada,
(Wet) Lake Maracaibo and territorial waters of the United States of America adjacent to the Continent of North America of water depths less than 10 feet at mean low tide excluding:

    (a)     North of the Arctic Circle and South of the Antarctic Circle; and

    (b)     Alaska.

Area 3     The Gulf of Mexico, Venezuelan waters, offshore California and the Gulf of Paria, excluding Area 2 (Wet) as defined above.

Area 4     Waters worldwide, excluding:

    (a)     Areas 2 (Wet) and 3 as defined above; and

    (b)     North of the Arctic Circle and South of the Antarctic Circle.

Area 5     North of the Arctic Circle and South of the Antarctic Circle.

**4.     REPORTING CLAUSE:**

This Section I is issued in consideration of a Drilling Minimum Earned and Deposit premium of $189,000 and the Insured shall report to Swett & Crawford, Inc. for transmittal to the Company within thirty (30) days after the end of each Quarterly Period of this Policy any Well Insured, Spud-In or Worked Over and any changes in the status of any other Well Insured during the reporting period and further agrees to pay premium at the rates provided herein. Premiums accruing from reports as required herein are due and payable as the reports are made.

Ed. (1/98)

HOL 01677

The Insured shall exercise reasonable care in maintaining records and fulfilling reporting requirements in this Section I, but an unintentional error or omission in such records or reports (other than the reporting of an Occurrence under Section IC) will not invalidate or limit coverage under this Section I.

5. **EXCLUSIONS:**

There shall be no indemnity or liability under this Section I for:

a.  Any fines or penalties imposed under the laws of any State or Nation or other Government entity, or any agency or subdivision thereof;

b.  Any punitive or exemplary damages including any other damages resulting from multiplication of compensatory damages;

c.  Any claims whatsoever arising from any Occurrence caused, in whole or in part, by any breach of any of the conditions and/or warranties set forth in Clause 6 of these Common Conditions;

d.  Any loss, damage or expense caused by or attributable to earthquake or volcanic eruption; or fire, explosion or tidal wave consequent upon earthquake or volcanic eruption;

but this exclusion does not apply to the following areas:

(1)  The Gulf of Mexico not East of 82° West Longitude and not South of 24° North Latitude, (the general term Gulf of Mexico shall be deemed to include tributary waters and the Gulf Intracoastal Waterway);

(2)  The North Sea;

(3)  North and South America excluding Alaska, California and Hawaii; and

(4)  Canada South of 60° North Latitude;

e.  Loss, damage or expense caused by the dishonesty, infidelity or fraud of the Insured or any officer or employee of the Insured;

f.  Loss, damage or expense as respects any Well Insured in the course of being drilled, deepened or Worked Over at the inception of this insurance, until final termination of said drilling, deepening or Working Over unless specifically agreed to by the Company. Such drilling, deepening or Working Over is

Ed. (1/98)

HOL 01678

inclusive of completion operations or total abandonment of the Well, whichever may come first;

g.  Loss, damage or expense caused by, resulting from or incurred as a consequence of an Occurrence which the Insured intended or expected.

**6.  DUE DILIGENCE CLAUSE AND/OR WARRANTIES:**

a.  It is a condition of this Policy that the Insured shall exercise due care and diligence in the conduct of all operations covered hereunder, utilizing all safety practices and equipment generally considered prudent for such operations, and in the event any hazardous condition develops with respect to a Well Insured, the Insured shall at his sole expense make all reasonable efforts to prevent the Occurrence of a loss insured hereunder.

b.  It is warranted that where the Insured is the operator or joint operator on any Well Insured being drilled, deepened or Worked Over, a blowout preventer of standard make will be set on the surface casing or on the wellhead and installed and tested when in accordance with all regulations, requirements and normal and customary practices in the industry for the area.

c.  It is further warranted that the Insured will use every reasonable endeavor to ensure that the Insured and/or the Insured's contractors shall comply with all regulations and requirements in respect of fitting storm chokes and other equipment to minimize damage or Pollution, and that all equipment (including drilling and/or workover rigs) will be manned by properly certified personnel where required by regulatory authorities.

d.  It is further warranted that in the event of a Well Insured becoming out of control or other escape or flow of drilling fluid, oil, gas or water, the Insured will use every reasonable endeavor to control the Well or stop the escape or flow.

e.  In consideration of the Company covering a Well Insured undergoing drilling or completion using an Underbalanced or Producing While Drilling technique, the following warranties shall apply:

1)  It is warranted that while such a Well Insured is undergoing drilling or completion, a blowout preventer configuration including one rotating head, one annular or "hydril" and one double ram type blowout preventer or equivalent applicable wellhead equipment in accordance with normal and customary practices in the industry, will be set on surface casing and tested in accordance with usual industry practices;

*Common Conditions*
5

Ed. (1/98)

HOL 01679

2)  It is warranted that the Insured will endeavor to eliminate or nullify any potential sources of ignition as is reasonably possible at or near the Well site whilst conducting drilling operations using Underbalanced or Producing While Drilling techniques.

3)  It is warranted that all oil and gas separators and/or processing and/or gathering equipment and/or tanks will be placed at a safe distance from the drilling or workover rig, so as to avoid the accumulation of hydrocarbons near the drilling or workover rig and/or unit.

When the Insured is a Non-Operator on any Well Insured, then the Insured will endeavor to ensure that the Well operator complies with this Paragraph 6.

## 7.   PARTIAL INTEREST CLAUSE:

The Combined Single Limit of Liability over Section IA, IB and IC hereof, the Insured's Retention, the Limit of Liability in endorsements to Section I (if any) and the rates expressed herein are for a 100% interest.  In the event that the interest of the Insured in any one Well Insured does not amount to 100%, then said Combined Single Limit of Liability over Section IA, IB and IC hereof, the Limit of Liability in endorsements to Section I, the Insured's Retention, and the premium applicable to that Well Insured, shall be reduced proportionately and shall apply in the same proportion as the total interest of the Insured in said Well Insured bears to 100%.  In the event of an Occurrence giving rise to a claim recoverable hereunder, the Company shall in no event be liable under Section IA, IB and IC and any endorsements thereto for a greater percentage interest in any such claim than the Insured's percentage interest in the Well Insured at the time that such Occurrence took place.

In the event the Insured becomes legally liable in a court of competent jurisdiction for an amount greater than his proportionate ownership interest, the Company agrees to provide coverage for the Insured to the extent that the legal liability increases the Insured's working interest percentage liability.  Even in the event that the Insured becomes legally liable for a greater percentage than his ownership interest, the partial interest portion of this condition shall still apply to the combination of the Insured's working interest percentage ownership and the additional percentage for which the Insured becomes legally liable, subject to additional premium to be agreed.

The Company shall retain all of the Insured's rights of subrogation against any party for which the Company has paid claims (under the extension of coverage afforded by this clause) to the extent of the Company's payments.

Ed. (1/98)

HOL 01680

8.   **DEFINITIONS:**

a.   The term "Bodily Injury" shall be defined as physical injury to a person including death, sickness, disease or disability and all mental injury, anguish or shock to such person resulting from such physical injury, and all mental injury, anguish or shock suffered by any relative of such person resulting from such physical injury.

b.   The term "Crater" shall be defined as a basinlike opening in the earth's surface surrounding a Well Insured caused by the eruptive action of gas and/or oil flowing without restriction.

c.   The term "Defense Costs" shall be defined as investigation, adjustment, settlement, litigation and legal expenses, premiums on attachment or appeal bonds, and pre and post judgment interest and shall exclude all expenses for salaried employees, general retainer fees normally paid by the Insured and office expenses of the Insured.

d.   The term "Developmental Well" shall be defined as a Well drilled to exploit a hydrocarbon accumulation discovered by previous drilling. However, Horizontal Drilling, Underbalanced or Producing While Drilling Wells shall, for the purposes of this insurance, never be considered a Developmental Well.

e.   The term "Horizontal Drilling" shall be defined as the directional drilling of a Well such that the borehole deviates at least 80° from vertical.

f.   The term "Occupational Disease" shall be defined as any injury, including death, sickness, disease or disability defined as occupational disease in any workers' compensation, unemployment compensation or disability benefits, laws, statutes or regulations of any jurisdiction in which a claim is made or the Occupational Disease arose.

g.   The term "Occurrence" shall be defined as one loss, disaster or casualty or series of losses, disasters or casualties arising out of one event.

(1)   As respects windstorm, all tornadoes, cyclones, hurricanes, similar storms and systems of winds of a violent and destructive nature, arising out of the same atmospheric disturbance within any period of seventy-two (72) consecutive hours commencing during the period of this insurance, shall be considered one event.

*Common Conditions*
7

Ed. (1/98)

HOL 01681

(2)    Each earthquake shock or volcanic eruption, unless excluded by Paragraph 5d. of these Common Conditions, shall constitute one event hereunder, provided that, if more than one earthquake shock or volcanic eruption shall occur within any period of seventy-two (72) consecutive hours commencing during the period of this insurance, such earthquake shocks or volcanic eruptions shall be deemed to be one event within the meaning hereof.

h.    The term "Pollution" shall be defined as contamination by any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, and chemicals.

i.    The term "Producing While Drilling" shall be defined as those methods of drilling whereby formation fluids are deliberately allowed into the bore of a drilling Well and thence removed to the surface while, at the same time, drilling activities are continued or are intended to be continued.

j.    The term "Spud-in" shall be defined as the moment at which the drill bit or tool first breaks the surface of the earth or water bottom at the commencement of drilling operations.

k.    The term "Underbalanced" shall be defined as that method of drilling whereby the terrastatic pressure is likely to exceed the pressure exerted by the drilling fluid column in the bore of the Well.

l.    The term "Well" shall be defined as a hole bored into the earth with the intention of discovering, delineating, producing from or exploiting and enhancing the recovery of, or the storing of oil and/or gas and/or sulfur, and/or thermal energy resources or deposits, or the disposal and/or injection and/or supply of gas or liquids including such conductor, casing, liner and/or tubing as may be installed therein and such Wellhead Equipment as may be installed immediately above the hole.

m.    The term "Well Insured" shall be defined as a Well for which rates are set forth in the Declarations hereto.

n.    The term "Wellhead Equipment" shall be defined as the equipment used to maintain surface control of a Well, including but not limited to the casing head, tubing head and christmas tree.

o.    The term "Work Over" shall be defined as those operations to rehabilitate, restore, initiate or increase hydrocarbon production in an existing Well Insured.

*Common Conditions*
8

Ed. (1/98)

HOL 01682

9.    **ATTACHMENT AND TERMINATION OF COVERAGE:**

    a.    Attachment of Coverage:

        (1)    In respect of any Well Insured, coverage shall attach when the Insured acquires an interest in such Well Insured unless coverage attaches later by operation of any of Paragraphs 9a(2), (3) or (4) below;

        (2)    In respect of any Well Insured Spud In during the period of this Policy, coverage shall attach at the time of "Spudding In";

        (3)    In respect of any Well Insured in the course of being drilled, deepened or Worked Over at the inception of this insurance, and which would have been insured hereunder at inception in the absence of Exclusion 5f of these Common Conditions, coverage shall attach upon final termination of said drilling, deepening or Working Over.  Such drilling, deepening or Working Over is inclusive of completion operations or total abandonment of the Well Insured, whichever may come first;

        (4)    In respect of any other Well Insured coverage shall attach at inception of this Policy.

    b.    Termination of Coverage:

        (1)    In respect of any Well Insured coverage shall terminate when the Insured ceases to have an interest in such Well Insured unless coverage is terminated sooner by operation of any of Paragraphs 9b(2), (3), (4) or (5) below;

        (2)    In the event the Insured has elected to purchase coverage only for Wells Insured in the course of being drilled, deepened and/or Worked Over, coverage for each Well Insured shall terminate upon either total and/or complete abandonment or completion of such Well Insured, which shall include the setting of pumping equipment or wellhead equipment or the dismantling or removal of the drilling equipment from the drill site, or the termination of the Insured's responsibility under contract, whichever shall first occur, except that if removal of the drilling equipment from the drill site occurs first, then the period of time between complete removal of such equipment and the commence3ment of completion operations shall not exceed one hundred eighty (180) days and the wells must be secured in accordance with normal industry practices and standards in order for said completion operations to be covered hereunder;

Ed. (1/98)

(3)   In the event the Insured has elected to purchase coverage for its other Wells at inception, then in respect of any Well Insured in the course of being drilled, deepened or Worked Over at the expiry or cancellation of this Policy, coverage shall terminate upon final termination of said drilling, deepening or Working Over notwithstanding the fact that said final termination may occur later than said expiry or cancellation.  Such drilling, deepening or Working Over is inclusive of completion operations or total abandonment of the Well Insured, whichever may come first;

(4)   In respect of coverage attaching for any Well Insured by operation of Paragraph 9a(2) which is temporarily abandoned or suspended, coverage shall terminate upon completion of the Well Insured or 365 days from the date such Well Insured was temporarily abandoned or suspended, whichever comes first;

(5)   In respect of any other Well Insured coverage shall terminate at the expiry or cancellation of this Policy or (if plugged and abandoned Wells are not insured hereunder) upon total and/or complete abandonment of such Wells Insured, whichever shall first occur.

10.   **SCHEDULE:**

A schedule of Wells Insured at inception is on file with Swett & Crawford, Inc.

11.   **DEFENSE:**

The Company shall not be called upon to assume the handling or control of the defense or settlement of any claim made against the Insured but the Company shall have the right, but not the duty, to participate with the Insured in the defense and control of any claim which may be recoverable in whole or in part under this Policy.

The Company shall not be called upon to pay any Defense Costs in relation to any claim until after the final resolution of such claim.

The Company shall not be liable to pay any Defense Costs unless the prior consent of the Company was obtained before those Defense Costs were incurred.

*Common Conditions*
10

Ed. (1/98)

HOL 01684

12.   **RELIEF WELLS:**

A relief Well drilled (regardless of spud date) for the purpose of controlling an out
of control Well Insured, crater or fire covered under Section IA and Wells Insured
redrilled pursuant to Section IB shall be held covered at a rate to be agreed in respect
of costs and expenses as set forth herein provided always that full details are given
to the Company and all special conditions and/or warranties are complied with by
the Insured.  In the event a relief Well becomes out of control it shall be considered
a continuation of the original Occurrence.

13.   **DELIBERATE WELL FIRING:**

Coverage as afforded herein shall not be prejudiced in the event that a Well out of
control has to be deliberately fired (a) at the local provincial or federal government's
direction; or (b) by the operator, due to the fact that governmental personnel are not
available, for safety reasons to prevent Bodily Injury and/or property damage to
third parties.

14.   **FARM IN/OUT WELLS:**

Coverage is provided herein for the Insured's interest (financial or otherwise) in farm
in Wells Insured, subject to an additional premium of 100% of the applicable rate.
This insurance is also extended to include the Insured's contingent interest in farm
out Wells Insured.

15.   **RETENTION:**

The Companys' Limit of Liability stated in Item 7. of the DECLARATIONS shall
apply excess of the Retention stated in Item 8. of the DECLARATIONS.  The
Company's obligation under this Policy applies only to the amount in excess of the
Retention.

Attached to and forming a part of St. Paul Surplus Lines Insurance Company
Policy No. MU05505777

Ed. (1/98)

HOL 01685

## SECTION IA

## CONTROL OF WELL INSURANCE

**1.  COVERAGE:**

The Company agrees, subject to the Combined Single Limit of Liability, terms and conditions of this Policy, to reimburse the Insured for actual costs and/or expenses incurred by the Insured (a) in regaining or attempting to regain control of any and all Wells Insured which get out of control, including any other Well that gets out of control as a direct result of a Well Insured getting out of control, but only such costs and/or expenses incurred until the Well is brought under control as defined in Paragraph 2b of this Section IA; and (b) in extinguishing or attempting to extinguish (i) fire above the surface of the ground or water bottom from a Well Insured or from any other Well which is burning as a direct result of Well(s) insured hereunder getting out of control or (ii) fire above the surface of the ground or water bottom which may endanger a Well Insured.

**2.  DEFINITIONS:**

a.   Well Out of Control:

For the purposes of this insurance, a Well shall be deemed to be out of control only when there is an unintended flow of drilling fluid, oil, gas or water above the surface of the ground, or water bottom in case of a Well located in water, which cannot be controlled by the blowout preventer or storm chokes or christmas tree or other equipment required by Paragraph 6. of the Common Conditions or when so declared by the appropriate United States and/or Canadian regulatory authority.

Nevertheless and for the purposes of this insurance, a Well shall not be deemed out of control solely because of the existence or Occurrence of a flow of oil, gas or water into the Well bore which can, within a reasonable period of time, be circulated out or bled off through the surface controls.

b.   Well Brought under Control:

For the purposes of this insurance a Well deemed out of control in accordance with Paragraph 2a of this Section IA shall, be deemed to be brought under control at the time that the flow giving rise to a claim hereunder stops, or is stopped and;

HOL 01686

(1)   the drilling, deepening or Working Over, or other similar operation taking place in the Well immediately prior to the Occurrence giving rise to a claim hereunder is resumed or can be resumed; or

(2)   the Well is or can be returned to the same producing, shut-in or other similar status that existed immediately prior to the Occurrence giving rise to a claim hereunder; or

(3)   when the Well is permanently plugged and abandoned in accordance with procedures approved by the appropriate regulatory authorities;

whichever shall first occur, unless the Well continues at that time to be declared out of control by the appropriate United States and/or Canadian regulatory authority, in which case, for the purposes of this insurance, the Well shall be deemed to be brought under control when such authority ceases to designate the Well as being out of control.

c.   Expenses:

Expenses recoverable hereunder shall include costs of materials and supplies required, the services of individuals or firms specializing in controlling Wells and directional drilling and similar operations necessary to bring the Well under control including costs and expenses incurred at the direction of regulatory authorities to bring the Well under control, and other expenses included within Clause 1 of this Section IA.

3.   **TERMINATION OF EXPENSES:**

In any circumstances, and subject always to Combined Single Limit of Liability of this Section I, Underwriters' liability for costs and/or expenses incurred in regaining or attempting to regain control of a Well shall cease when the Well is brought under control as defined in Paragraph 2b of this Section IA.

4.   **EXCLUSIONS:**

There shall be no indemnity or liability under this Section IA for:

a.   any loss of or damage to any drilling or production equipment;

b.   any loss of or damage to any Well or Wells, or hole or holes;

HOL 01687

c.   any loss, damage or expense caused by or arising out of delay (including delayed and/or deferred production) and/or loss of use and/or loss of or damage to production (including that due to loss of reservoir pressure) and/or loss of or damage to any reservoir or reservoir pressure.

Attached to and forming a part of St. Paul Surplus Lines Insurance Company Policy No. MU05505777

*Section IA*
3

Ed. (1/98)

HOL 01688

## SECTION IB

## REDRILL/EXTRA EXPENSE

1. **COVERAGE:**

   The Company agrees, subject to the Combined Single Limit of Liability, terms and conditions of this Policy, to reimburse the Insured for actual costs and/or expenses reasonably incurred to restore or redrill a Well, or any part thereof, which has been lost or otherwise damaged as a result of crater or an Occurrence giving rise to a claim which would be recoverable under Section IA of this Policy if the Insured's Retention applicable to Section IA were nil, subject to the following conditions:

   a. The Company shall reimburse the Insured only for such costs and expenses as would have been incurred to restore or redrill a Well had the most prudent and economical methods been employed.

   b. There shall be no coverage under this Section IB for restoration or redrilling of any Well which can be completed through drill stem left in the Well, or which can be completed through a relief Well drilled for the purpose of controlling a Well unless agreed by the Company.

   c. In no event shall the Company be liable for cost and/or expenses incurred (a) with respect to drilling Wells, to drill below the depth reached when the Well became out of control as defined in Clause 2 of Section IA of this Policy and (b) with respect to other Wells, to drill below the geologic zone or zones from which said Wells were producing or capable of producing.

   d. In any circumstances, the Company's liability under this Section IB for costs and expenses shall cease in any event when the depths set forth in Paragraph 1c of this Section IB have been reached and the Well restored to a condition comparable to that existing prior to the Occurrence giving rise to the claim, or so far as possible utilizing generally available equipment and technology.

   e. The Insured agrees to advise the Company if restoration or redrill has not commenced within 540 days from date of accident, cancellation or expiry of this Policy, whichever shall occur last and such restoration or redrill shall be held covered at terms, rates and conditions to be agreed by the Company.

*Section IB*
1

Ed. (1/98)

HOL 01689

2.  **EXCLUSIONS**:

There shall be no indemnity or liability under this Section for:

a.  any loss of or damage to any drilling or production equipment;

b.  any loss, damage or expense caused by or arising out of delay (including delayed and/or deferred production) and/or loss of use and/or loss of or damage to production (including that due to loss of reservoir pressure) and/or loss of or damage to any reservoir or reservoir pressure, it being expressly understood and agreed that the Company's indemnity does not extend to or include any efforts to re-establish or stimulate production at or to any level, whether or not comparable to that existing prior to a loss insured hereunder;

c.  costs and/or expenses incurred to restore or redrill any relief Well, or any part thereof;

d.  any claim recoverable under this Policy solely by reason of the addition or attachment to Section IA of this Policy of the Making Wells Safe Endorsement;

e.  redrilling and/or recompletion or for in-hole equipment in respect of any Well that was plugged and abandoned prior to loss or damage covered under Section IA hereof and that remained plugged and abandoned at the time of such loss or damage.

Attached to and forming a part of St. Paul Surplus Lines Insurance Company Policy No. MU05505777

*Section IB*
2

Ed. (1/98)

HOL 01690

## SECTION IC

## POLLUTION AND CLEANUP

1.   **INSURING AGREEMENTS:**

The Company, subject to Section I Combined Single Limit of Liability, terms and conditions of this Policy, agrees to indemnify the Insured against:

a.   all sums which the Assured shall by law or under the terms of any oil and/or gas and/or thermal energy lease and/or license be liable to pay for the cost of remedial measures and/or as damages for Bodily Injury and/or loss of, damage to or loss of use of property caused directly by Pollution above the surface of the ground or waterbottom and arising from a Well Insured;

b.   the cost of, or of any attempt at, removing, nullifying or cleaning up Pollution emanating from a Well Insured, including the cost of containing and/or diverting the Pollution and/or preventing the Pollution from reaching the shore;

c.   costs and expenses incurred in the defense of any claim or claims resulting from actual or alleged, Pollution arising from a Well Insured, including Defense Costs and costs and expenses of litigation awarded to any claimant against the Insured, provided, however, that the inclusion of the above costs and expenses shall in no way extend the Combined Single Limit of Liability of the Company over Section I of this Policy;

provided always that such Pollution results from all of the following:

(1)   an accident or Occurrence taking place during the period of this insurance (including any continuation thereof provided for by Clause 9 of the Common Conditions);

(2)   an accident or Occurrence that became known to the Insured and/or the Operator of the Well Insured within 90 days of its commencement;

(3) an accident or Occurrence that was reported to the Company within 180 days of becoming known to the Insured and;

(4) an accident or Occurrence giving rise to a claim which would be recoverable under Section IA of this Policy and endorsements thereto if the Insured's Retention applicable to Section IA were nil.

*Section IC*
1

Ed. (1/98)

HOL 01691

2.   **COST AND APPEALS CLAUSE:**

In the event of any claim and/or series of claims arising out of one Occurrence where the Insured's final gross claim is likely to exceed the Retention of the Insured, no costs under this Section IC shall be incurred on behalf of the Company without the consent of the Company, and if such consent is given, the Company shall consider such costs as part of the final claim hereunder.  No settlement of losses by agreement shall be effected by the Insured without the consent of the Company where the Insured's final gross claim will exceed the Retention of the Insured.

In the event that the Insured elects not to appeal against a judgment in excess of the Retention of the Insured, the Company may elect to conduct such appeal at their own cost and expense, and shall be liable for the taxable cost and interest incidental thereto, but in no event shall the liability of the Company exceed the Combined Single Limit of Liability over Section I of this policy.

3.   **EXCLUSIONS:**

There shall be no indemnity under this Section IC for any costs or any actual or alleged liability of the Insured:

a.   for any loss of or damage to any drilling or production equipment at the site of any Well Insured;

b.   recoverable under this Policy solely by reason of the addition or attachment to Section IA of this Policy of the Underground Control of Well Endorsement;

c.   arising directly or indirectly from Pollution if such Pollution:

(1)   is deliberate from the standpoint of the Insured or any other person or organization acting for or on behalf of the Insured;

(2)   results directly from any condition which is an intentional violation of or intentional noncompliance with any governmental rule, regulation or law applicable thereto; notwithstanding the foregoing, this exclusion does not apply with respect to any such condition which at the time of loss is in the process of being corrected by a schedule or program sanctioned and approved by the appropriate governmental authority with jurisdiction over such rule, regulation or law, to the extent that the Insured is in compliance with such schedule or program;

*Section IC*
2

Ed. (1/98)

d.  for mental injury, anguish or shock unless same results from physical injury to the claimants.

e.  to evaluate, monitor, control, remove, nullify and/or clean-up Pollution but only if such liability arises solely from any obligations imposed by an applicable statute, rule, ordinance, regulation;

f.  to abate or investigate any threat of Pollution;

g.  arising out of or during the transportation, handling, processing, treatment, storage, disposal or dumping of any waste or used materials or substances;

h.  for Bodily Injury and property damage under Clause 1.a. above and seepage, pollution and contamination under Clause 1.b. above which the Insured intended or expected;

i.  for Bodily Injury and property damage under Clause 1.a. above and Pollution under Clause 1.b. above which is caused by or arises out of asbestos, polychlorinated biphenyls; silica; benzene; lead; talc; dioxin; electromagnetic fields; or any substance containing such materials or any derivative thereof;

j.  for Bodily Injury

    1) arising out of Occupational Disease

    2) to any employees, including leased or borrowed employees, of any Insured;

k.  under any workers' compensation, unemployment compensation or disability laws, statutes, or regulations;

l.  any liability caused by or arising out of delay and/or loss of use and/or production or loss of or damage to reservoirs, or loss of reservoir pressure.

Attached to and forming a part of St. Paul Surplus Lines Insurance Company Policy No. MU05505777

*Section IC*
3

Ed. (1/98)

HOL 01693

SECTION I
ENDORSEMENT NO.          INCLUDED AT INCEPTION

POLICY PERIOD:

POLICY NO.

EFFECTIVE DATE:

INSURED:

## UNDERGROUND CONTROL OF WELL ENDORSEMENT

Effective from inception and in consideration of premium charged, Section IA is amended as follows:

Section IA. 2. DEFINITIONS a. Well Out of Control, is deleted in its entirety and replaced with the following:

a.    Well Out of Control:

For the purposes of this insurance, a Well shall be deemed to be out of control only when there is an unintended flow of drilling fluid, oil, gas or water above the surface of the ground, or water bottom in case of a Well located in water, or when there is an unintended subsurface flow of oil, gas, water and/or fluid from one subsurface zone to another subsurface zone via the bore of the Well, which cannot be controlled by the blowout preventer or storm chokes or christmas tree or other equipment required by Paragraph 6. of the Common Conditions or stopped by increasing the weight by volume of drilling fluid or by the use of other conditioning materials in the Well or when so declared by the appropriate United States or Canadian regulatory authority.

Nevertheless and for the purposes of this insurance, a Well shall not be deemed out of control solely because of the existence or Occurrence of a flow of oil, gas or water into the Well bore which can, within a reasonable period of time, be circulated out or bled off through the surface controls.

HOL 01694

The following is added to Section IA 4. EXCLUSIONS:

d.   costs and/or expenses incurred solely for the purpose of extinguishing or attempting to extinguish fire below the surface of the ground or waterbottom.

All other terms and conditions remain unchanged.

SPA-400-01
Ed. (1/98)

*Underground Control of Well Endorsement*
2

HOL 01695

SECTION I
ENDORSEMENT NO.        INCLUDED AT INCEPTION

POLICY PERIOD:

POLICY NO.

EFFECTIVE DATE:

INSURED:

### EXTENDED REDRILL AND RESTORATION COSTS ENDORSEMENT

In respect of Wells Insured and in consideration of premium charged and subject to all terms and conditions and exclusions stated in Section IB and the Combined Single Limit of Liability applicable thereto, Paragraph 1. COVERAGE of Section IB of this Policy is extended to cover reimbursement to the Insured for actual costs and expenses reasonably incurred to restore or redrill a Well Insured, or any part thereof, which has been lost or otherwise damaged as a direct result of physical loss of or damage to the drilling and/or workover and/or production equipment and/or riser and/or platform and/or any other structure or watercraft utilized as a foundation for or to support (a) Well(s) by:

    a.    lightning
    b.    fire
    c.    explosion or implosion above the surface of the ground or waterbottom
    d.    collision with land, sea or air conveyance or vehicle
    e.    windstorm
    f.    collapse of derrick or mast
    g.    flood
    h.    strikes
    i.    riots
    j.    civil commotions or malicious damage
    k.    crater

and where covered under Section IA, earthquake, volcanic eruption or tidal wave; and in respect of wet Wells only, collision or impact of anchors, chains, trawl boards or fishing nets.

All other terms and conditions remain unchanged.

SPA-400-03a
Ed. (1/98)

*Extended Redrill and Restoration Costs Endorsement*

HOL 01696

SECTION I
ENDORSEMENT NO.                    INCLUDED AT INCEPTION

POLICY PERIOD:

POLICY NO.

EFFECTIVE DATE:

INSURED:

## EVACUATION EXPENSES ENDORSEMENT

In respect of Wells Insured and in consideration of premium charged and subject to all
terms and conditions and exclusions stated therein and the Combined Single Limit of
Liability applicable thereto, Section IA of this Policy is endorsed to cover reimbursement
to the Insured for reasonable costs and/or expenses which the Insured incurs in the
evacuation of people (other than the Insured's employees or those of contractors or
subcontractors of the Insured), animals and/or property (other than the Insured's property
or that of contractors or subcontractors of the Insured), but only where and to the extent
that the evacuation has taken place by order of and/or is authorized by any local, state or
federal governmental or regulatory authority or public emergency service, and only
following a Well out of control as defined in Section IA of this Policy, fire, or escape of oil
and/or gas or the imminent threat thereof, which has resulted, or would result, in a claim
recoverable elsewhere under this insurance if the Insured's Retention applicable thereto
were nil.

Costs and expenses, if covered hereunder by the terms and conditions set forth above, shall
include but not be limited to all reasonable costs of transportation, costs of storage,
keeping or lodging and/or maintaining evacuated people, animals and/or property.

**EXCLUSION:**

There shall be no indemnity or liability under this endorsement for loss of use of evacuated
property and loss of earnings or any other income by any evacuated persons.

All other terms and conditions remain unchanged.

SPA-400-04
Ed. (1/98)

*Evacuation Expenses Endorsement*

HOL 01697

SECTION I
ENDORSEMENT NO.        · INCLUDED AT INCEPTION

POLICY PERIOD:

POLICY NO.

EFFECTIVE DATE:

INSURED:

## MAKING WELLS SAFE ENDORSEMENT

In respect of Wells Insured and in consideration of premium charged and subject to all terms and conditions and exclusions stated in Section IA and the Combined Single Limit of Liability applicable thereto, Paragraph 1. COVERAGE of Section IA of this Policy is extended to cover reimbursement to the Insured for the actual costs and expenses incurred in preventing the Occurrence of a loss insured hereunder when the drilling and/or workover and/or production equipment and/or riser and/or platform and/or any other structure or watercraft utilized as a foundation for or to support (a) Well(s) has been directly lost or damaged by:

a.   lightning
b.   fire
c.   explosion or implosion above the surface of the ground or waterbottom
d.   collision with land, sea or air conveyance or vehicle
e.   windstorm
f.   collapse of derrick or mast
g.   collision or impact of anchors, chains, trawl boards or fishing nets;
h.   flood
i.   strikes
j.   riots
k.   civil commotions or malicious damage
l.   where covered under Section IA, earthquake, volcanic eruption or tidal wave
m.   crater

but only when, in accordance with all regulations, requirements and normal and customary practices in the industry, it is necessary to reenter the original Well in order to continue operations or restore production from or plug and abandon such Well.

*Making Wells Safe Endorsement*
1

HOL 01698

The Company's liability for costs and expenses incurred by reason of this endorsement shall cease at the time that:

(1)    operations or production can be safely resumed, or

(2)    the Well is or can be safely plugged and abandoned,

whichever shall first occur.

All other terms and conditions remain unchanged.

SPA-400-05a
Ed. (1/98)

*Making Wells Safe Endorsement*
2

HOL 01699

SECTION I
ENDORSEMENT NO.                    INCLUDED AT INCEPTION

POLICY PERIOD:

POLICY NO.

EFFECTIVE DATE:

INSURED:
### TURNKEY WELLS - OPERATOR/NON-OPERATOR

Effective at inception and in consideration of the premium charged, Common Conditions
Paragraph 2. RATING PROVISIONS of Section I is amended as follows:

In the event the Named Insured has an operating or non-operating interest in a Well
Insured while being drilled on a Turnkey basis, the rate applicable to said Well Insured
shall be:

1)   50% of the drilling rate if completion operations are performed and not included in
     the Turnkey contract.

2)   20% of the drilling rate if completion operations are performed and included in the
     Turnkey contract.

3)   20% of the drilling rate if completion operations are not performed.

4)   100% of the drilling rate if at any point during the Turnkey drilling operation the
     Well Insured reverts to a "daywork" or "footage" basis.

5)   100% of the drilling rate if the Well Insured is deepened past the Turnkey depth on a
     "daywork" or "footage" basis.

For the purpose of this endorsement, a Turnkey Well shall be defined as a Well in which
the drilling contractor assumes liability of the Insured, as provided by this insurance, until
the turnkey depth as defined by the Turnkey contract has been reached.


All other terms and conditions remain unchanged.

SPA-400-07a
Ed. (1/98)


*Turnkey Wells - Operator/Non-Operator*

SECTION I

ENDORSEMENT NO.          INCLUDED AT INCEPTION

POLICY PERIOD:

POLICY NO.

EFFECTIVE DATE:

INSURED:

## REMOVAL OF WRECKAGE AND/OR DEBRIS ENDORSEMENT

Subject to the Combined Single Limit of Liability applicable thereto, Section I of this Policy is extended to afford coverage for the removal of wreckage and/or debris of property of the Insured, owned or leased in whole or in part, provided such removal is required by a legal or contractual obligation of the Insured and resulting from a loss covered by Section I; however, it is agreed that from any such claim shall be deducted the value of any property salvaged or recovered, inuring finally and irrevocably to the benefit of the Insured.  At the option of the Insured, the expenses may be payable only after all covered costs are paid.  There shall be no coverage afforded by this Endorsement for physical loss or damage to any property.  There shall be no coverage afforded by this Endorsement for Pollution and clean-up.

All other terms and conditions remain unchanged.

SPA-400-14
Ed(1/98)

*Removal of Wreckage and/or Debris Endorsement*

HOL 01701

GENERAL CONDITIONS
ENDORSEMENT NO.              INCLUDED AT INCEPTION

POLICY PERIOD:

POLICY NO.

EFFECTIVE DATE:

INSURED:

### INFORMATION TECHNOLOGY HAZARDS CLAUSE

In consideration of the premium charged, this policy does not cover any claim for:

i.    loss of, or damage to, or
ii.   reduction or alteration in the functionality or operation of;

     computer system, computer hardware, computer program, computer software, data, information repository, microchips, integrated circuit or similar devices in or connected with computer equipment or non-computer equipment.

However, this exclusion shall not apply if such losses arise directly out of:

a)  lightning;
b)  fire;
c)  explosion or implosion above the surface of the ground or waterbottom;
d)  collision with land, sea or air conveyance or vehicle;
e)  windstorm;
f)  collision or impact of anchors, chains, trawl boards or fishing nests;
g)  flood;
h)  where covered under Section IA, earthquake, volcanic eruption or tidal wave.

All other terms and conditions remain unchanged.

SPA-400-51
ED. (1/02)

*Information Technology Hazards Clause*

HOL 01702

# GENERAL CONDITIONS

### 1.   INSURING SECTIONS:

Each Insuring Section is a separate insurance unto itself affected only by the provisions in its respective Section and the provisions in the General Conditions of the Policy.  In the event of conflict between a specific provision of an Insuring Section and the General Conditions, the specific provision of the Insuring Section shall prevail.  Provisions in one Insuring Section shall not affect coverage in another Insuring Section, it being the intent of both the Insured and the Company that the same coverage is provided by this one Policy with its several Insuring Sections as if separate policies were issued for each Insuring Section.

### 2.   THE COMPANY:

In accordance with the authorization granted to Swett & Crawford, Inc. by St. Paul Surplus Lines Insurance Company (hereinafter referred to as the Company), and in consideration of the premium specified herein, the Company does hereby bind to insure in accordance with the terms and conditions contained herein or endorsed hereon.

### 3. SERVICE OF SUIT AGAINST THE COMPANY IN RESPECT OF WELLS LOCATED IN THE UNITED STATES OF AMERICA ONLY, IF ANY:

It is agreed that in the event of the failure of this Company hereon to pay any amount claimed to be due hereunder, this Company hereon, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court. However, the Company may appeal a decision by that Court.

It is further agreed that service of process in such suit may be made upon President of the Company, or his/her nominee, at 385 Washington Street, St. Paul , Minnesota 55102 and that in any suit instituted against any one them upon this Policy this Company will abide by the final decision of such Court or of any Appellate Court in the event of appeal.  However, the service of process in such suit may also be made upon or sent to the Commissioner, Director, or Superintendent of Insurance for the state in which the suit is being filed.  The Company designates that appropriate officer, or that person's successor, to mail a copy of the papers to the Company.

*General Conditions*
1

Ed. (1/02)

HOL 01703

For the State Of California, we authorize David Kuhn, 500 South Kraemer Boulevard, Suite 200, Brea, CA 92821-6728, to be served and to mail the Company the papers.

For the State Of Rhode Island we authorize John J. Pasterczyk, 23 Kennedy Road, Foster, RI 02825, to be served and to mail the Company the papers.

Any of the above-named is authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the request of the Insured to give a written undertaking to the Insured that it or they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

4.   **CANCELLATION:**

This Policy may be canceled by the Insured at any time by written notice or by surrender of this Policy to Swett & Crawford, Inc.  This Policy may also be canceled by the Company or by Swett & Crawford, Inc. on their behalf by delivering to the Insured or by mailing to the Insured, by registered, certified or other first class mail, at the Insured's address as shown in this Policy, written notice stating when not less than sixty (60) days thereafter, such cancellation shall be effective.  Should this Policy be canceled by the Insured, the earned premium shall be either the premium earned in accordance with the rating provisions of this Policy with the Company retaining the customary short rate proportion of the premium or the minimum premium, if any, due in accordance with Policy provisions, whichever is greater.  Should this Policy be canceled by the Company, the earned premium shall be the premium earned in accordance with the rating provisions of this Policy with the Company retaining the pro- rata proportion of the premium and no minimum premium shall be applied.

This insurance may be canceled by the Company or by Swett & Crawford, Inc. on their behalf for nonpayment of premium, by delivering to the Insured or by mailing to the Insured by registered, certified or other first class mail, at the Insured's address as shown in this Policy, written notice stating when, not less than ten (10) days thereafter, such cancellation shall be effective.

5.   **BANKRUPTCY AND INSOLVENCY:**

In the event of the bankruptcy or insolvency of the Insured or any entity comprising the Insured, the Company shall not be relieved thereby of the payment of any claims recoverable hereunder because of such bankruptcy or insolvency.

6.   **EXAMINATION OF RECORDS:**

The Insured shall keep records of all the insured property in such manner that the Company can accurately determine the amount of loss.

*General Conditions*
2

Ed. (1/02)

HOL 01704

The Company shall be permitted at any reasonable time to inspect the Insured's premises and operations and to examine and audit the Insured's books and records directly pertaining to the subject matter of this insurance.

**7. MISREPRESENTATION AND FRAUD:**

This entire Policy shall be void if, whether before or after a loss, the Insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein, or incase of any fraud or false swearing by the Insured relating thereto.

**8. CARRIERS OR BAILEES:**

This insurance shall in no way inure directly or indirectly to the benefit of any carrier or other bailee.  The Insured may accept without prejudice to this insurance the ordinary bills of lading used by carriers, including released or partially released value bills of lading.

**9. ABANDONMENT:**

There can be no abandonment to the Company of any property.

**10. SUIT AGAINST THE COMPANY:**

It is a condition of this insurance that no suit, action or proceeding for the recovery of any claim hereunder shall be maintainable in any court of law or equity unless the same be commenced (a) within two years and one day after the time a cause of action accrues or (b) if by the laws of the state or nation of the address of the Insured shown herein such limitation is invalid, then within the shortest limit of time permitted by the laws of such state or nation.

**11. ASSIGNMENT OF POLICY:**

This Policy shall be void if assigned or transferred without the written consent of the Company.

**12. RESIDUAL VALUE:**

In the event of an Occurrence giving rise to a claim recoverable within the terms and conditions of this Policy, the residual value of any equipment and/or materials used or purchased by the Insured in respect of such Occurrence will inure to the benefit of the Company in the adjustment of such claim.

*General Conditions*
3

Ed. (1/02)

13. **SALVAGE AND RECOVERIES:**

All salvages, recoveries and payments recovered or received subsequent to a loss settlement under this Policy shall be applied as if recovered or received prior to the said settlement and all necessary adjustments shall be made by the parties hereto.

14. **OTHER INSURANCE:**

In the event there is other insurance which inures to the Insured's benefit covering any of the interests and expenses covered hereunder, this insurance shall not attach until such other insurance is exhausted unless such insurance is specifically excess of the limits provided hereunder.

15. **NOTICE OF LOSS:**

The Insured shall as soon as practicable report in writing to the Company through Swett & Crawford, Inc. every loss, damage or Occurrence which may give rise to a claim under this Policy. The Insured shall also file with the Company through Swett & Crawford, Inc. a detailed sworn proof of loss as soon as practicable.

16. **LOSS ADJUSTMENT AND PAYMENT OF CLAIMS:**

Loss, if any, under this insurance (except as otherwise specifically provided) shall be adjusted with and payable to the Insured herein in whom title to, or interest in, the exposure involved in such loss is vested at the time of the loss, or as directed by the Insured.

All adjusted claims shall be paid to the Insured as soon as practicable after acceptance of satisfactory proof of interest and loss at the offices of the Company.

17. **EXAMINATION UNDER OATH:**

The Insured, as often as may be reasonably required, shall exhibit to any person designated by the Company all that remains of any property herein described, and shall submit, and insofar as is within his or their power cause his or their employees, members of the house-hold and others to submit to examinations under oath by any person named by the Company and subscribe the same; and, as often as may be reasonably required, shall produce for examination all writings, books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or their representative and shall permit extracts and copies thereof to be made. No such examination under oath or examination of books or docu-ments, nor any other act of the Company or any of its employees or representatives in connection with the investigation of any loss or claim hereunder, shall be deemed a waiver

*General Conditions*
4

HOL 01706

of any defense which the Company might otherwise have with respect to any loss or claim, but all such examinations and acts shall be deemed to have been made or done without prejudice to the Company's liability.

18. **APPRAISAL:**

If the Insured and the Company fail to agree as to the amount of loss, each shall, on the written demand of either, made within sixty (60) days after receipt of proof of loss by the Company, select a competent and disinterested appraiser, and the appraisal shall be made at a reasonable time and place. The appraisers shall first select a competent and disinterested umpire, and failing for fifteen (15) days to agree upon such umpire, then, on the request of the Insured or the Company, such umpire shall be selected by a judge of a court of record in the state in which such appraisal is pending. The appraisers shall then appraise the loss, stating separately the actual cash value at the time of loss and the amount of loss, and failing to agree shall submit their differences to the umpire.

An award in writing of any two shall determine the amount of loss. The Insured and the Company shall each pay his or their chosen appraiser and shall bear equally the other expenses of the appraisal and umpire. The Company shall not be held to have waived any of it's rights by any act relating to appraisal.

19. **EXTENDED EXPIRATION:**

If this Policy should expire or be canceled while an Occurrence giving rise to a loss recoverable under this Policy is in progress, it is understood and agreed that said loss, subject to all other terms and conditions and the Limits of Liability provided herein, will be covered under this Policy as if the entire loss had occurred prior to the expiration or cancellation.

20. **WAR EXCLUSION:**

Notwithstanding anything to the contrary contained herein, this Policy does not cover loss, damage or expense resulting from:

(1)  war, hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack (a) by any government or sovereign power (de jure or de facto) or by any other authority maintaining or using military, naval or air forces; or (b) by

*General Conditions*
5

Ed. (1/02)

HOL 01707

military, naval or air forces; or (c) by any agent of any such government, power, authority or forces;

(2) any weapon of war, employing atomic fission or radioactive force whether in time of peace or war;

(3) insurrection, rebellion, revolution, civil war, usurped power, or action by governmental authority in hindering, combating or defending against such an Occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of government or public authority, or risks of contraband or illegal transportation or trade;

## 21.  TERRORIST EXCLUSION:

Notwithstanding anything to the contrary contained herein, this Policy does not cover any claim caused by, resulting from or incurred as a consequence of:

(1) (a) The detonation of any explosive;

(b) Any weapon of war;

and caused by any person acting maliciously or from a political motive; or

(2) Any act for political or terrorist purposes of any persons, and whether or not agents of a sovereign power, and whether the loss, damage or expense resulting therefrom is accidental or intentional;

## 22.  SUBROGATION:

a.  The Company shall upon reimbursement hereunder to the Insured of any loss, damage or expense be subrogated to all the Insured's rights of recovery against any other person, firm or corporation who may be legally or contractually liable for such loss, damage or expense so reimbursed by the Company.

b.  It is agreed that the Company may make claim upon and institute legal proceedings against any parties believed responsible for loss, damage or expense reimbursed hereunder in the name of the Insured, and the Insured shall provide the Company their full cooperation in pursuing such claim or legal proceedings.

*General Conditions*
6

Ed. (1/02)

HOL 01708

    c.    Permission is expressly granted to the Insured to waive the Company's rights of subrogation against any individual, firm or corporation who or which is under contract or otherwise performing work for the Insured or for whom or which the Insured is performing work or rendering services, provided always such waiver is executed in writing prior to any Occurrence giving rise to claims for reimbursement hereunder.

    d.    Except as specifically provided or permitted by this Policy, the Insured shall not waive, release or diminish rights of recovery or subrogation with respect to any claim, which, upon payment thereof by the Company, would otherwise belong or accrue to the Company, and insofar as and to the extent that any action by the Insured waives, releases or diminishes the rights of recovery or subrogation in respect of such claim, the Company shall have no liability under this Policy.

## 23.   ERRORS AND OMISSIONS IN REPORTING:

It is understood and agreed that the Insured will exercise reasonable care in maintaining records, fulfilling reporting requirements in this Policy and preparing information for premium purposes only, but an unintentional error or omission in such records, reports or information (other than the reporting of an Occurrence under Section IC, if applicable) will not invalidate or limit coverage under this Policy.

## 24.   INSTITUTE RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE:

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith

    In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to by or arising from:

    1.1    ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel.

Ed. (1/02)

HOL 01709

1.2  the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation reactor or other nuclear assembly or nuclear component thereof.

1.3  any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

**25.  RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE (U.S.A. ENDORSEMENT):**

This insurance is subject to the Institute Radioactive Contamination Exclusion Clause provided that if fire is an insured peril and, where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions and, a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clause 1.1 and 1.2 of the Institute Radioactive Contamination Exclusion Clause any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation or radioactive contamination arising directly or indirectly from that fire.

**26.  AUTOMATIC ACQUISITION:**

It is understood and agreed that this Policy is automatically extended to cover additional property and/or interests, not exceeding existing top value or Limit of Liability, as described in this Policy which may be acquired or otherwise become at the risk of the Insured during the term of this Policy within the territorial limits stated herein subject to the values for such additional property and/or interests being reported to the Company as soon as practicable and subject to an additional premium (if any) to be agreed.

**27.  DUE DILIGENCE CLAUSE:**

It is a condition of this insurance that the Insured shall exercise due care and diligence in the conduct of all operations covered hereunder, utilizing all safety practices and equipment generally considered prudent for such operations, and in the event any hazardous condition develops with respect to any insured property, the Insured shall at their sole expense make all reasonable efforts to prevent the Occurrence of a loss insured hereunder.

Attached to and forming a part of St. Paul Surplus Lines Insurance Company Policy No. MU05505777

*General Conditions*
8

Ed. (1/98)

HOL 01710

# EXHIBIT "P-4"

Filed
07 July 24 P3:01
Margaret G. Montemayor
District Clerk
Bexar District

CAUSE NO. 2005ci03287

| | | |
|---|---|---|
| HOLLIMON OIL CORPORATION, | § | IN THE DISTRICT COURT OF |
| FELICIANA CORPORATION, | § | |
| DUNCAN UNDERWOOD, | § | |
| EVERETT DeSHA and | § | |
| SEELIGSON OIL COMPANY, LTD. | § | |
| BERTRAND BAETZ, JR., JUDY BARKER, | § | |
| SCOTT BROWN, GAPCO ENERGY, LLC | § | |
| HANSON RESOURCES COMPANY | § | |
| JESSIE HELLUMS, ANNE MEREDITH | § | |
| HOLLIMON TRUST, JANE ELIZABETH | § | |
| HOLLIMON TRUST, KAY HOLLIMON, | § | |
| ANNE C. HORN, 2001 LONG BALL, LTD., | § | |
| ROBERT MAGEE, INC., MEDINA | § | |
| EXPLORATION COMPANY, DBM | § | |
| INTERESTS, LTD., ROBERT SCOTT | § | |
| THREE LEE MINERALS, LLC, | § | |
| TRIDUNDA, LTD., U.S. ENERCORP, LTD., | § | |
| J. CHARLES HOLLIMON, LTD., SALEM | § | |
| CREEK OIL & GAS, INC., THREE LEE | § | |
| INVESTMENTS, LTD., DAVID WALKER | § | |
| Plaintiffs/Cross-Defendant | § | |
| | § | |
| v. | § | BEXAR COUNTY, TEXAS |
| | § | |
| BAY ROCK OPERATING COMPANY | § | |
| Defendant | § | |
| | § | |
| v. | § | |
| | § | |
| UNISON DRILLING, INC. | § | 45TH JUDICIAL DISTRICT |
| Cross-Claimant | § | |
| | § | |

**PLAINTIFFS' FOURTH AMENDED PETITION**

COMES NOW, Plaintiff Hollimon Oil Corporation ("Hollimon") and Feliciana Corporation

("Feliciana"), Duncan Underwood, Everett DeSha and Seeligson Oil Company, Ltd. ("Seeligson"),

Bertrand Baetz, Jr., Judy Barker, Scott Brown, GAPCO Energy, LLC, Hanson Resources Company,

Jessie Hellums, Anne Meredith Hollimon Trust, Jane Elizabeth Hollimon Trust, Kay Hollimon,

Anne C. Horn, 2001 Long Ball, Ltd., Robert Magee, Inc., Medina Exploration Company, DBM

Interests, Ltd., Robert Scott, Three Lee Minerals, LLC, Tridunda, Ltd., U.S. Enercorp, Ltd., J. Charles Hollimon, Ltd., Salem Creek Oil L& Gas, Inc., Three Lee Investments, Ltd., David Walker ("Working Interest Owner Plaintiffs") (collectively "Plaintiffs") in the above entitled and numbered cause and files this cause of action against Defendant Bay Rock Operating Company ("Bay Rock"). Plaintiffs suffered significant damages from the blowout of one of its wells. The blowout was caused by Defendant's failure to plan and supervise the drilling of the well in a proper, reasonable and safe manner. Wherefore, Plaintiffs would respectfully show the Court as follows:

## DISCOVERY CONTROL PLAN

1.      Plaintiffs intend to conduct discovery pursuant to Level 2 of Texas Rule of Civil Procedure 190.

## PARTIES

2.      Plaintiff, Hollimon, is a corporation duly formed and organized under the laws of the State of Texas, with its principal office and place of business in the city of San Antonio, Bexar County, Texas.

3.      Plaintiff, Feliciana, is a corporation duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of Houston, Harris County, Texas.

4.      Plaintiff, Duncan Underwood, is an individual residing in Houston, Harris County, Texas.

5.      Plaintiff, Everett DeSha, is an individual residing in Houston, Harris County, Texas.

6.      Plaintiff, Seeligson Oil Company, Ltd., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of Houston, Harris County, Texas.

7.      Plaintiff, Bertrand Baetz, Jr. is an individual residing in Bexar County, Texas.

8.      Plaintiff, Judy Barker, is an individual residing in Bexar County, Texas.

9.      Plaintiff, Scott Brown, is an individual residing in Bexar County, Texas.

10.     Plaintiff, GAPCO Energy, LLC, is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of Houston, Harris County, Texas.

11.     Plaintiff, Hanson Resources Company, is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of Houston, Harris County, Texas.

12.     Plaintiff, Jessie Hellums, is an individual residing in Bexar County, Texas.

13.     Plaintiff, Anne Meredith Hollimon Trust, is an individual residing in Bexar County, Texas.

14.     Plaintiff, Jane Elizabeth Hollimon Trust, is an individual residing in Bexar County, Texas.

15.     Plaintiff, Kay Hollimon, is an individual residing in Bexar County, Texas.

16.     Plaintiff, Anne C. Horn, is an individual residing in Bexar County, Texas.

17.     Plaintiff, 2001 Long Ball, Ltd., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas.

18.     Plaintiff, Robert Magee, Inc., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of Houston, Harris County, Texas.

19.     Plaintiff, Medina Exploration Company, is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas.

20.     Plaintiff, DBM Interests, Ltd., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas.

21.     Plaintiff, Robert Scott, is an individual residing in Bexar County, Texas.

22.     Plaintiff, Three Lee Minerals, LLC, is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas.

23.     Plaintiff, Tridunda, Ltd., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of Houston, Harris County, Texas.

24.     Plaintiff, U.S. Enercorp, Ltd., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas.

25.     Plaintiff, J. Charles Hollimon, Ltd., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas.

26.     Plaintiff, Salem Creek Oil & Gas, Inc., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas.

27.     Plaintiff, Three Lee Investments, Ltd., is a limited partnership duly formed and organized under the laws of the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas

28.     Plaintiff, David C. Walker, is an individual residing in Bexar County, Texas.

29.     Defendant, Bay Rock, is a corporation duly formed and organized under the laws of

the State of Texas with its principal office and place of business in the city of San Antonio, Bexar County, Texas.  Defendant has been served through its registered agent, John MacDiarmid, at 305 West Kings Highway, San Antonio, Texas, 78212.

## JURISDICTION

30.     Jurisdiction is proper in this Court because all Defendants are residents of the State of Texas, and the damages suffered by Plaintiffs are within the jurisdictional limits of the court.

## VENUE

31.     Pursuant to the Texas Civil Practice & Remedies Code § 15.002(a)(3) and § 15.005, venue is proper in the county of any defendant's principal office.  Venue is proper in this Court because the principal office of Defendant, Bay Rock, is located in Bexar County.

## FACTUAL BACKGROUND

32.     Hollimon is operator of the Streibeck No. 1 Well in Live Oak County, Texas ("the Well").  Feliciana, Duncan Underwood, Everett DeSha and Seeligson are non-operating interest owners in the Well.

33.     Plaintiffs retained Bay Rock to design the Well and to plan and supervise the drilling of the Well.  There was no written agreement between Plaintiffs and Bay Rock, but the parties entered an oral contract to drill the well to a target depth of 8,800 feet.  That contract contemplated that Bay Rock would utilize its skill and experience to ensure that the Well was drilled in a safe and prudent manner.

34.     Bay Rock selected Unison Drilling Company ("Unison") as the drilling contractor for the Well.  Bay Rock selected Unison's "Rig No. 3" as the drilling rig and crew to drill the Well. Unbeknownst to Plaintiffs, "Rig No. 3" was rated to only 8,000 feet and was equipped with a blowout preventer ("BOP") stack rated to 3,000 psi.

35.     The Well was spud on or about July 15, 2003.  On or about July 31, 2003, the Well

had been drilled to 7,236 feet where a string of 7-inch casing was set and cemented. On or about August 3, 2003, the drilling crew drilled out through the cement and immediately lost circulation.

36.     On or about August 5, 2003, after the Well had been drilled to approximately 8142 feet, the Well was observed to be flowing with a gas kick in progress. The well was shut in with the annular preventer (hydril) of the BOP stack and mud was pumped into the well. The hydril began to leak, and the pipe rams on the BOP stack were closed. Mud continued to be pumped into the Well with little or no returns at the surface. Eventually all available mud was pumped into the Well.

37.     At or about 12:30 am on August 6, 2003, the pipe rams of the BOP began to leak. The rig was evacuated, and at or about 1:00 am on August 6, 2003, the flow from the Well ignited.

38.     Cudd Well Control ("Cudd") was called out to control the Well. On or about August 14, 2003, the well was capped, and the flow was diverted to a flare pit where it was burned.

39.     As a result of the Well blowout, Plaintiffs incurred significant damages, including but not limited to well control costs, restoration/redrill costs, liability to third parties, evacuation and pollution costs, lost production from the Well, delayed production, and damage to the reservoir.

## CAUSES OF ACTION

### A.     Negligence and Gross Negligence

40.     Defendant was negligent and/or grossly negligent in its selection of Unison's "Rig No. 3" to drill the Well. Defendant knew that the Well was planned to be drilled to 8,800 feet where pressures were expected to be above 3,000 psi. Defendant knew that Rig No. 3 was only rated to drill to 8,000 feet and was only equipped with a 3,000 psi BOP. Defendant owed Plaintiffs a duty to select the appropriate equipment to safely drill the Well. Defendant knew or should have known that Rig No. 3 was inadequate to drill the Well. Defendant's failure to select an appropriate rig was a proximate cause of the blowout.

41.     Defendant was negligent and/or grossly negligent in failing to properly plan the

drilling of the Well.  Defendant owed Plaintiffs a duty to properly plan the Well before drilling commenced.  Defendant's failure to properly plan the Well includes, but is not limited to, failure to provide a written well plan, failure to provide a written drilling procedure, failure to provide written supervision instructions, and failure to identify necessary equipment for safe drilling.  Defendant's failure to properly plan the Well was a proximate cause of the blowout.

42.    Defendant was negligent and/or grossly negligent in failing to properly supervise the drilling of the Well.  Defendant owed Plaintiffs a duty to properly supervise the drilling of the Well.  Defendant's failure to properly supervise the drilling of the Well includes, but is not limited to, failure to ensure that proper well control measures were taken upon the signs of an underbalanced situation, failure to ensure that all well control equipment was in proper working order, and failure to ensure that enough mud was available to control a gas kick in the Well.  Defendant's failure to properly supervise the drilling of the Well was a proximate cause of the blowout.

B.    **Breach of Contract**

43.    Plaintiffs contracted with Defendant to design the Well and to plan and supervise the drilling of the Well.  Defendant had a duty to, among other things, perform the contract with reasonable care and due diligence.  Defendant breached the contract by, among other things, failing to create a written well plan and drilling procedure and failing to plan and supervise the drilling of the Well with care and diligence.  Defendant's breach of contract caused injury to Plaintiffs.

**DAMAGES**

44.    The damages suffered by Plaintiffs, which are unliquidated, are within the jurisdictional limits of the court.  Plaintiffs' damages include, but are not limited to, repair, completion and evaluation of the well, well control, lost gas sales, and redrill of the well known as Dougherty Streibeck #1.

45.   <u>NOT TO BE READ TO JURY</u>

St. Paul, as subrogee, is the real party in interest with respect to part of the damages sought herein.  In this regard, St. Paul seeks damages not in excess of $2,857,787.65, the amount it paid to its insured, Plaintiff/subrogor, Hollimon Oil Corporation and/or Working Interest Owner Plaintiffs.  All damages sought in excess of $2,857,787.65 are being sought by Plaintiffs Feliciana Corporation, Duncan Underwood, Everett DeSha and Seeligson Oil Company, Ltd., to the extent of their uninsured working interests in the well.

## ATTORNEYS' FEES

46.   Plaintiffs seek reimbursement for its reasonable attorneys' fees under Texas Civil Practice & Remedies Code § 38.001, *et seq.*

## CONDITIONS PRECEDENT

47.   All conditions precedent have been performed or have occurred as required by Texas Rule of Civil Procedure 54.

## PRAYER

48.   Plaintiffs Hollimon Oil Corporation, Feliciana Corporation, Duncan Underwood, Everett DeSha and Seeligson Oil Company, Ltd. pray for judgment against Defendant Bay Rock for the following:

a.   Actual damages;

b.   Exemplary damages;

b.   Reasonable attorneys' fees;

c.   Pre-judgment and post-judgment interest as allowed by law;

d.   Costs of suit; and,

e.   Such other and further relief, special or general, legal or equitable, to which Plaintiffs may be justly entitled.

Respectfully submitted,

**WESTMORELAND HALL, P.C.**

By: _____

George H. Lugrin
Texas Bar No. 00787930
Jeffrey E. Fahys
Texas Bar No. 24038886
Williams Tower, Suite 6400
2800 Post Oak Boulevard
Houston, Texas 77056-6125
(713) 871-9000 - Telephone
(713) 871-8962 - Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel of record this 24th day of July, 2007 via the method indicated below.

Ricardo Reyna                VIA FACSIMILE AND CERTIFIED US MAIL, RRR
Gregory R. Hokenson
BROCK PEARSON GUERRA REYNA, P.C.
1506 Bexar Crossing
San Antonio, Texas 78232-1587

Michael L. Darrah            VIA FACSIMILE AND CERTIFIED US MAIL, RRR
Pro Hac Vice
DURBIN, LARIMORE & BIALICK
920 North Harvey
Oklahoma City, Oklahoma 73102-2610

Ronald E. Mendoza           VIA FACSIMILE AND CERTIFIED US MAIL, RRR
Bryan P. Marshall
DAVIS, CEDILLO & MENDOZA, INC.
755 E. Mulberry Ave.
San Antonio, Texas 78212

Jeffrey E. Fahys